# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-3824

_____

| | | |
|---|---|---|
| Robert K. Murphey, Jr., | * | |
| | * | |
| Plaintiff-Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| City of Minneapolis, | * | |
| | * | |
| Defendant-Appellee. | * | |

_____

Submitted: November 17, 2003

Filed: February 26, 2004

_____

Before MURPHY, LAY, and FAGG, Circuit Judges.

_____

LAY, Circuit Judge.

Robert K. Murphey, Jr. appeals the district court's grant of summary judgment in favor of his former employer, the City of Minneapolis (the "City"), in a suit brought under the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213. On appeal, Murphey argues the district court erred in holding that there is no genuine issue of material fact as to whether he can perform the essential functions of his job, with or without reasonable accommodation. The district court held, in that regard, that Murphey failed to provide an explanation as to the alleged inconsistency between his ADA claim and his application for permanent disability benefits from the Public Employees Retirement Association ("PERA"). We reverse and remand.

# I. Background

Murphey began working for the City in June of 1971 as a seasonal laborer. In November of 1977, Murphey injured his lower back on the job and was off work for a period of five years, during which time he attended the University of Minnesota. Murphey returned to work in the summer of 1983.

Murphey continued to work for the City between 1983 and 1997 as a laborer. In 1987, 1995, and 1996, Murphey re-injured his lower back by lifting heavy objects. Following each injury, Murphey could not return to work for three to four weeks. In May of 1997, Murphey again re-injured his lower back while dragging a large water hose up an incline and was absent from work for three or four weeks. Following this injury, he was placed under certain medical restrictions, including a lifting restriction of twenty pounds, bending restrictions, and a restriction prohibiting prolonged sitting or standing. Murphey returned to work in approximately June of 1997 and worked part time as a Painter's Assistant until October of 1997.

In October of 1997, Murphey was placed on workers' compensation. He did not return to work until the spring of 1998, when he worked in the Finance Department for a few hours a day sorting water bills. In the late summer or early fall of 1998, Murphey began working in the Lands and Buildings Department doing light janitorial duties. He refused to perform these duties after six to eight weeks because the work irritated his back injury.

On October 13, 1998, Murphey met with Mary Page, a human resources generalist for the City, about entering the City's Return to Work Job Bank Program ("Job Bank").[1] Because Murphey refused to continue performing the light-duty

---

[1]The Job Bank is available to City employees who sustain work-related injuries and are unable to return to their pre-injury job as a result of permanent work

janitorial work, he did not enter the Job Bank in October of 1998. This led the City to discontinue Murphey's workers' compensation benefits, a decision Murphey appealed.

In November of 1998, while he was not working for the City, Murphey applied for disability benefits from PERA.[2] As part of the application, Murphey's physician submitted a Medical Disability Report in which he expressed his opinion that Murphey met the PERA statute's standards for "total and permanent disability." Murphey's application for PERA disability benefits was approved on May 19, 1999. The effective date of Murphey's PERA benefits was October 14, 1998, and he received the benefits through August of 2001.[3]

On January 7, 1999, Murphey and the City entered into a Stipulation of Settlement related to his workers' compensation claim. As part of the settlement, Murphey agreed that he would enter the Job Bank after completion of a chronic pain management program. Murphey completed a three-week chronic pain management program in March of 1999, and was subsequently advised in a letter, dated July 6, 1999, that the City was offering him a temporary position as an Engineering Aide I. The start of this job on July 12, 1999, marked Murphey's entry into the Job Bank.

---

restrictions attributable to their work-related injury. The Job Bank is designed to help injured employees locate and secure suitable City employment that can be performed within their medical restrictions. Injured employees enter the Job Bank for a period of 120 days. If the City is unable to find another position for an injured employee within 120 days, the employee is terminated from City employment.

[2]PERA members may obtain retirement, survivor, and disability benefits under programs established by Minnesota law. See Minn. Stat. §§ 353.01-353.88.

[3]Murphey also received total disability benefits through a mortgage insurance policy with U.S. Life Credit Life Insurance Company in various months during 1999 and 2000.

Murphey was able to complete the Engineering Aide I duties within his medical restrictions, but he worked only four hours per day.[4] On October 15, 1999, Murphey and his workers' compensation attorney met with Mary Page, Nancy Ross, Murphey's workers' compensation claims coordinator, and Assistant City Attorney Ed Backstrom to discuss Murphey's status as an Engineering Aide I. Murphey was told that his supervisors were satisfied with his work and that he was doing an excellent job. The parties also discussed classes Murphey could take to enhance his skills. Murphey left the meeting believing he had secured a permanent job as an Engineering Aide I, but he admitted that no one had guaranteed him a job with the City. Murphey therefore presumed that because he had found a permanent job within 120 days of entering the Job Bank, he no longer faced termination under this rule.

The City did not share Murphey's belief that a permanent job had been found for him. By letter dated November 3, 1999, the City informed Murphey that he had been released from City service because his injury and resulting restrictions did not allow him to return to his pre-injury position and no other appropriate position was available.[5] Murphey immediately called Mary Page to see why he had received the letter. Ms. Page informed him that there had been a mistake. Nancy Ross and Frank Samlaska, a qualified rehabilitation consultant for Murphey, also told Murphey that his termination had been a mistake, but the City never took any action to reverse the

---

[4]Murphey initially began working eight hours per day, but he had to reduce his time to four hours per day because the long drive from his home to work irritated his back and he was dealing with the death of his daughter who died on June 9, 1999, following a car accident.

[5]The letter incorrectly informed Murphey that his 120-day period in the Job Bank ended on November 2, 1999. However, because Murphey entered the Job Bank on July 12, 1999, when he began working as an Engineering Aide I, the 120-day period did not end until November 8, 1999. The November 2, 1999 date appears to have been calculated based on information that Murphey entered the Job Bank on July 6, 1999.

termination. Even though Murphey had been terminated from employment, he continued to work for the City as an Engineering Aide I on a "permit" basis until November 30, 1999.

On March 15, 2000, Murphey filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging the City discriminated against him on the basis of his disability. The EEOC issued a Notice of Right to Sue on September 25, 2000. On December 14, 2000, Murphey brought an action under the ADA in Minnesota state court. The City removed the action to federal court on January 2, 2001. The district court subsequently granted the City's motion for summary judgment on Murphey's ADA claim, and this appeal followed.

## II. Discussion

We review a grant of summary judgment *de novo*, applying the same standards as the district court and construing the record in the light most favorable to the nonmoving party. See Cravens v. Blue Cross and Blue Shield of Kansas City, 214 F.3d 1011, 1016 (8th Cir. 2000).

The ADA prohibits employers from discriminating "against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). The term "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." Id. § 12111(8). In order to establish a claim under the ADA, a plaintiff must show (1) that he is disabled within the meaning of the ADA; (2) that he is qualified to perform the essential functions of the job either with or without reasonable accommodation; and (3) that he has suffered adverse employment action because of his disability. Fjellestad v. Pizza Hut of Am., Inc., 188 F.3d 944, 948 (8th Cir. 1999).

In granting summary judgment, the district court relied on Cleveland v. Policy Management Systems Corp., 526 U.S. 795 (1999), in ruling that Murphey had not met his burden of presenting a sufficient explanation of the apparent inconsistency between his ADA claim and his successful application for PERA disability benefits. In Cleveland, the plaintiff brought an ADA suit against her former employer after she had sought Social Security Disability Insurance ("SSDI") benefits and one week before the SSDI benefits were awarded to her. Id. at 798-99. In her application for SSDI benefits, her request for reconsideration, and her hearing with the Social Security Administration, the plaintiff made sworn statements that she was "disabled" and "unable to work" due to her disability. Id. The Supreme Court was faced with the question of "whether the law erects a special presumption that would significantly inhibit an SSDI recipient from simultaneously pursuing an action for disability discrimination under the [ADA]." Id. at 797.

The Court held that an application for SSDI benefits and a claim under the ADA do not inherently contradict each other such that the pursuit and receipt of SSDI benefits prevents a plaintiff from successfully asserting an ADA claim. Id. at 802-03. Although the Supreme Court made it clear that a party may pursue an ADA claim even after he has successfully applied for SSDI benefits, the Court held that an ADA plaintiff cannot simply ignore the apparent contradiction that arises from the plaintiff's sworn assertion in an application for disability benefits that he or she is unable to work. Id. at 806. To that end, the Court ruled that

> [w]hen faced with a plaintiff's previous sworn statement asserting "total disability" or the like, the court should require an explanation of any apparent inconsistency with the necessary elements of an ADA claim. To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless "perform the essential functions" of [his or] her job, with or without "reasonable accommodation."

Id. at 807.

Although Murphey's case did not involve SSDI benefits, the district court concluded that Cleveland applied to Murphey's successful application for PERA disability benefits. The district court held that because Murphey failed to meet his burden under Cleveland there was no genuine issue of fact about whether he could perform the essential functions of his job, with or without reasonable accommodation. We disagree with the district court's conclusion that Cleveland applied in this case.

The district court first reasoned that Cleveland applied because Murphey represented in his application to PERA, although not in the form of a sworn statement, that he was totally and permanently disabled and that his impairment rendered him unable to engage in any substantial gainful activity. Murphey argues on appeal that he made no such representations. We agree.

Murphey's application for PERA disability benefits included the following information: (1) his demographic information; (2) his choice of a full survivor benefit; (3) a description of his disability;[6] (4) the names of the physicians he consulted for his disability; (5) the medical treatment he received; (6) his employment information; (7) his choices regarding state and federal tax income withholding; and (8) his notarized signature. Nowhere in the application did Murphey make the representations ascribed to him by the district court. In contrast, the plaintiff in Cleveland specifically stated in her pursuit of SSDI benefits that she was disabled and unable to work. Id. at 798.

The only section of the application directly applicable to whether Murphey was totally and permanently disabled was found in a separate form completed by Murphey's physician. This section asked whether, in the physician's opinion,

---

[6]Murphey described his disability as "Severe Spinal Stenosis. A deteri[or]ation of lower spinal area caused by repeated injuries, i.e. 1977, 1987, 1995, 1996, 1997."

Murphey met the PERA statute's standards for total and permanent disability.[7] Murphey's physician answered this section affirmatively. We hold, however, that the physician's opinion does not amount to a "sworn statement" or representation *by Murphey* that he is totally and permanently disabled and unable to work. Compare Cleveland, 526 U.S. at 807 (requiring a sufficient explanation of the apparent inconsistency between *a plaintiff's* previous sworn statement in an application for disability benefits and the plaintiff's ADA claim).[8]

The district court also reasoned that Cleveland applied because the eligibility requirements for SSDI benefits were virtually identical to the eligibility requirements for total and permanent disability benefits through PERA. "Disability" for purposes

---

[7]"Total and permanent disability" is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to be of long-continued and indefinite duration[, meaning] that the disability has been or is expected to be for a period of at least one year." Minn. Stat. § 353.01, subd. 19.

[8]The district court also relied on Motley v. New Jersey State Police, 196 F.3d 160 (3d Cir. 1999), in concluding that it was appropriate to apply Cleveland. The plaintiff in Motley applied for disability benefits through a program established by state law. Id. at 163. In his application, the plaintiff averred that he was qualified for disability benefits because he was permanently and totally disabled, and he made additional statements to support his assertion. Id. at 166-67. The plaintiff's subsequent suit against his employer under the ADA was dismissed on summary judgment. Id. at 162. The Third Circuit affirmed on the basis that the plaintiff had not provided a sufficient explanation of the inconsistencies between his previous statements of permanent and total disability and his ADA claim. Id. 166-67.

We agree with the district court that Motley supports a conclusion that Cleveland may apply to a plaintiff who has obtained disability benefits under a state law by representing that he is totally disabled and unable to work. However, as we have previously discussed, Murphey's application for PERA disability benefits includes no representations by Murphey akin to those in Cleveland or Motley.

-8-

of SSDI benefits is defined as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Although this definition is quite similar to the PERA statute's definition of "total and permanent disability," we hold there is a critical distinction between the eligibility requirements for PERA disability benefits and SSDI benefits. The essential difference between the two statutory schemes is that a person receiving PERA disability benefits based on total and permanent disability is allowed to return to work without losing his benefits. See Minn. Stat. § 353.33, subd. 7.

Under the PERA statute, if a person receiving disability benefits "resumes a gainful occupation from which earnings are less than the salary at the date of disability or the salary currently paid for similar positions," the disabled person will continue to receive disability benefits in an amount that makes up the difference. Id. In contrast, a person receiving SSDI benefits who resumes substantial gainful activity generally is ineligible to continue receiving SSDI benefits. See 42 U.S.C. § 423(e)(1). While it is true that a person entitled to SSDI benefits is granted a nine-month trial work period during which the person may test his or her ability to work and still be considered disabled, see 42 U.S.C. § 422(c) and 20 C.F.R. § 404.1592(a), if the person continues to work following the trial work period, his or her SSDI benefits are suspended. 20 C.F.R. § 404.1596(b)(1)(ii). However, a person receiving PERA disability benefits who returns to work may continue to work and receive benefits as long as his earnings are less than his previous salary or the salary for similar positions. Minn. Stat. § 353.33, subd. 7.

In the present case, Murphey applied for PERA disability benefits in November of 1998 during a time when he was not working. His doctor opined that Murphey's disability had continued or could be expected to continue for a period of at least one year. Presumably, the person responsible for determining whether Murphey was

eligible for PERA disability benefits followed the statutory requirements of reviewing Murphey's medical records and relevant information. See Minn. Stat. § 353.33, subd. 4. Murphey's application for disability benefits was approved by PERA on May 19, 1999, before he returned to work for the City. Although Murphey returned to work on July 12, 1999, this did not make him ineligible for disability benefits under the terms of the PERA statute.[9] Id. at subd. 7.

Based on the foregoing analysis, we conclude that there is no inconsistency between Murphey's successful application for and receipt of PERA disability benefits and his ADA claim that he could perform the essential functions of his job, with or without reasonable accommodation.[10] Thus, we hold the district court erred in applying Cleveland to dispose of Murphey's ADA claim.

---

[9]The district court pointed out that the essence of the reasoning underlying Cleveland was that

> in the absence of an explanation, an individual who has secured disability benefits under one federal law by representing that she is unable to work cannot turn around and seek damages under a second federal law by making the apparently inconsistent representation that she can perform the essential functions of her job, with or without reasonable accommodation.

The district court concluded that this reasoning applies with equal force to individuals who seek and obtain disability benefits under state law by making similar representations. We do not take issue with the district court's analysis in this respect. However, given the divergent requirements for SSDI and PERA disability benefits and our conclusion that Murphey did not make representations akin to those in Cleveland, our holding does not conflict with the reasoning underlying Cleveland.

[10]Because we hold that Cleveland does not apply, we need not address whether Murphey provided the explanation required by Cleveland.

-10-

### III. Conclusion

The district court erred in granting summary judgment in favor of the City based on its conclusion that <u>Cleveland</u> applied to Murphey's application for PERA disability benefits. Therefore, we reverse the judgment of the district court and remand the case for further consideration.

_____